# In the United States Court of Federal Claims

NOT FOR PUBLICATION
Bid Protest
No. 18-253C
Filed Under Seal: July 12, 2018
Reissued for Publication: July 30, 2018[*]

| | | |
|---|---|---|
| CSI AVIATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Post-Award Bid Protest; Judgment Upon |
| v. | ) | the Administrative Record; RCFC 52.1; |
| | ) | Injunctive Relief; Best Value |
| THE UNITED STATES, | ) | Determination. |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLASSIC AIR CHARTER, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

   *Eric J. Marcotte, Esq.*, Counsel of Record, *David M. Hernandez*, Of Counsel, *Kelly E. Buroker*, Of Counsel, *Tamara Droubi*, Of Counsel, Vedder Price PC, Washington, DC, for plaintiff.

   *Douglas G. Edelschick*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirchman, Jr.*, Director, *Chad A. Readler*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *Cassandra A. Maximous*, Associate Legal Advisor, Office of the Principal Legal Advisor, United States Immigration and Customs Enforcement, United States Department of Homeland Security, Washington, DC, for defendant.

---

[*] This Memorandum Opinion and Order was originally filed under seal on July 12, 2018 (docket entry no. 51), pursuant to the Protective Order entered in this action on February 22, 2018 (docket entry no. 15). The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the Protective Order.  The parties filed a joint status report on July 27, 2018, indicating the redactions they contend are warranted (docket entry no. 53).  And so, the Court is reissuing its Memorandum Opinion and Order, dated July 12, 2018, with the adopted redactions indicated by three consecutive asterisks within brackets ([***]).

*Robert K. Tompkins*, Counsel of Record, *Rodney M. Perry*, Of Counsel, *Leila S. George-Wheeler*, Of Counsel, *David C. Kully*, Of Counsel, Holland & Knight, LLP, Washington, DC, for defendant-intervenor

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I.   INTRODUCTION

In this post-award bid protest matter, CSI Aviation, Inc. ("CSI") challenges the United States Department of Homeland Security, Immigration and Custom Enforcement's ("ICE") decision to award a contract to provide certain charter aircraft services, flight crews, medical crews, and crews of aviation security officers (the "Charter Flight Contract") to Classic Air Charter, Inc. ("CAC").  As relief, CSI requests that the Court:  (1) set aside ICE's award decision; (2) enjoin ICE and CAC from proceeding with performance under the Charter Flight Contract; (3) order ICE to terminate the Charter Flight Contract and to either re-open the procurement or to award the contract to CSI; and (4) award certain declaratory relief.  Am. Compl. at Prayer for Relief.

The parties have filed cross-motions for judgment upon the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  *See generally* Pl. Mot.; Def. Mot.; Def.-Int. Mot.  For the reasons set forth below, the Court:  (1) **DENIES** CSI's motion for judgment upon the administrative record; (2) **GRANTS** the government's and CAC's cross-motions for judgment upon the administrative record; and (3) **DISMISSES** the amended complaint.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Factual Background

In this post-award bid protest matter, CSI challenges ICE's decision to award a contract to provide certain charter aircraft services, flight crews, medical crews, and crews of aviation security officers to CAC, pursuant to Request for Quote No. HSCECR-17-Q-00005 (the "RFQ").  Am. Compl. at ¶¶ 1-2.  Specifically, CSI challenges ICE's evaluation process for the award of

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR") and the Amended Complaint ("Am. Compl.").  Except where otherwise noted, all facts recited herein are undisputed.

the Charter Flight Contract. *See generally id.* As relief, CSI requests that the Court: (1) set aside ICE's award decision; (2) enjoin ICE and CAC from proceeding with performance under the Charter Flight Contract; (3) order ICE to terminate the Charter Flight Contract and to either re-open the procurement or to award the contract to CSI; and (4) award certain declaratory relief. *Id.* at Prayer for Relief.

### 1.  The RFQ And The Charter Flight Contract

The key facts in this bid protest matter are undisputed. CSI is a corporation located in Albuquerque, New Mexico and a disappointed offeror in connection with the RFQ for the Charter Flight Contract. *Id.* at ¶¶ 1, 16. CSI has served as an aviation program manager for ICE for more than ten years. *Id*. at ¶ 4.

ICE is responsible for the detention, health, welfare, transportation, and deportation of alien detainees in removal proceedings, and those subject to final order of removal from the United States. AR Tab 3 at 43; AR Tab 6 at 333. ICE's Air Operations Division is responsible for carrying out orders for the required departure of detainees that are handed down in removal proceedings, and ICE is also responsible for "providing reliable, safe, and secure mass air transportation of alien nationals placed in [F]ederal custody." AR Tab 3 at 43; AR Tab 6 at 333.

On June 14, 2017, ICE issued the RFQ seeking proposals from vendors holding contracts under the General Services Administration Schedule 599 for daily charter flight services for the agency's Air Operations Division to support ICE's enforcement and removal operations. AR Tab 3 at 32; AR Tab 6 at 320. The services requested included providing two general charter aircraft services—charter flights staged out of Miami, Florida; Alexandria, Louisiana; Brownsville, Texas; San Antonio, Texas; and Mesa, Arizona—and special high risk charter flights for the transportation of aliens from the United States who are subject to final orders of removal. AR Tab 3 at 43; AR Tab 6 at 333.

The RFQ provides that ICE would award a single task order for the requested daily charter flights services. AR Tab 3 at 32, 69; AR Tab 6 at 320, 359. In this regard, the performance of work statement contemplates the award of a task order with a one-year base period and four, one year option periods. AR Tab 3 at 44; AR Tab 6 at 334. Specifically, the RFQ requires that offerors propose a fleet of ten daily scheduled large aircraft ("DSLA") that would "be exclusively available for flights every Monday through Friday, 52 weeks per year."

AR Tab 3 at 44; AR Tab 6 at 334.  In addition, the RFQ states that ICE would make an award based upon a best value trade-off basis, considering the following three evaluation factors and three subfactors:

| I | Technical Capability |
|---|---|
| | 1. Technical Approach/Quality Assurance Surveillance Plan ("QASP") |
| | 2. Charter Aviation Experience |
| | 3. Key Personnel |
| II. | Past Performance |
| III. | Price |

AR Tab 3 at 74-78; AR Tab 6 at 364-68.  In addition, the RFQ instructs offerors to submit proposals in three volumes:  (1) Technical Quote; (2) Past Performance; and (3) Price Quote and Basis of Estimates.  AR Tab 3 at 69-70; AR Tab 6 at 359-60.

With respect to the first evaluation factor—Technical Capability—the RFQ provides that the Technical Capability factor would be evaluated based upon three subfactors to arrive at an overall technical capability rating and that the ratings used would be "Outstanding," "Good," "Acceptable," "Marginal," and "Unacceptable."  AR Tab 3 at 76; AR Tab 6 at 366.  In this regard, the RFQ also provides that, under the Technical Approach/QASP subfactor, offerors must demonstrate that their approach would meet ICE's requirements, including "their capability to meet the exclusive use aircraft requirements contained in the [performance work statement] . . . ."  AR Tab 3 at 71; AR Tab 6 at 361.  To that end, the RFQ requires that offerors provide the following information for each proposed DSLA aircraft:

1. Provide FAA certifications in accordance with 14 CFR Part 121 or Part 135;
2. Provide FAA registration number(s);
3. Identify aircraft owner;
4. Identify number of seats and configuration;
5. Identify aircraft make and model for each aircraft proposed;
6. Provide copies of required insurance and liability and hull insurance coverage; [and]
7. Outline how the offeror will comply with the requirements of FAA 117.

AR Tab 3 at 71-72; AR Tab 6 at 361-62.

With respect to the Charter Aviation Experience subfactor, the RFQ requires that offerors provide a list "describing their previous experience providing charter aircraft services."  AR Tab 3 at 72; AR Tab 6 at 362.  This list should include the following information:

• All certificate holders' aviation safety records.

4

- All certificate holders' compliance with Title 14 CFR Part 121 or 135.
- Number of years of corporate experience in providing large-scale, on-demand charter air services similar in size, scope, and complexity with this requirement.
- Number of years providing other relevant charter air services.
- Number of years of corporate experience supporting governmental and law enforcement agencies.

AR Tab 3 at 72; AR Tab 6 at 362.  The RFQ also requires that offerors indicate, as a part of their descriptions, whether previous charter aviation services had been performed by the offeror, the offeror's key personnel, or the offeror's subcontractors.  AR Tab 3 at 72; AR Tab 6 at 362.

Lastly, with respect to the Key Personnel subfactor, the RFQ requires that offerors provide the resume of their proposed project manager, to include a description of the individual's relevant experience, education, and qualifications.  AR Tab 3 at 72; AR Tab 6 at 362.  In this regard, the RFQ provides that the project manager must have a minimum of five years of project management experience with "large, high risk, sensitive projects and division level management experience managing projects and staff of comparable scope to the effort assigned."  AR Tab 3 at 72-73; AR Tab 6 at 362-63.  And so, the RFQ requires that the project manager's resume address items, such as charter aviation operations experience, including government charter aviation management.  AR Tab 3 at 73; AR Tab 6 at 363.

With respect to the second evaluation factor—the Past Performance factor—the RFQ requires that offerors provide "at least 2 and up to 5 past performance references that reflect recent relevant experience performed within the last 3 years." AR Tab 3 at 73; AR Tab 6 at 363. The RFQ also provides that ICE would only consider references evaluated as "relevant to this requirement in terms of size, scope, and complexity."  AR Tab 3 at 75-76; AR Tab 6 at 365-66. In addition, the RFQ provides that ICE would use the following ratings to evaluate the Past Performance factor: "High Confidence (Outstanding)," "Substantial Confidence (Good)," "Satisfactory Confidence (Satisfactory)," "Limited Confidence (Marginal)," "No Confidence (Unsatisfactory)," and "Unknown Confidence (Neutral)."[2]  AR Tab 3 at 77; AR Tab 6 at 367.

---

[2] The RFQ also contains the following definitions for evaluating and scoring the aforementioned factors and subfactors:

| Strength | Any aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal or provides the increased probability of successful performance of the contract. |
|---|---|

Lastly, with respect to the third evaluation factor—the Price factor—the RFQ requires that offerors provide a comprehensive price quotation, including a basis of estimate that details the price build-up of the quoted prices and rates.  AR Tab 3 at 74; AR Tab 6 at 364.  To that end, the RFQ requires that ICE evaluate each offeror's price quote for accuracy, completeness, and reasonableness.  AR Tab 3 at 78; AR Tab 6 at 368.

Finally, the RFQ describes the relative importance of each of the three evaluation factors and three subfactors as follows:

> The technical evaluation sub-factors above are in descending order of relative importance.  Sub-factors 1 through 3 are referred to collectively as Technical Capability.  In the evaluation, each sub-factor will be separately scored, forming the basis of an overall Technical Capability score.  Overall Technical Capability will be significantly more important that Past Performance.  Technical Capability and Past Performance, when combined, will be significantly more important than Price.  As Technical Capability and Past Performance scores approach equality, price will become more important in making the award determination.  In the event that two or more quotes are determined to be technically equivalent, award may be made to the lower priced quote.  Award may be made to a higher priced and higher

| Weakness | A flaw in a proposal that increases the risk of unsuccessful contract performance. A weakness need not be corrected for a proposal to be considered for award but may affect the proposal rating. |
| --- | --- |
| Deficiency | A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance. |
| Low Risk | Has little potential to cause disruption of schedule, increased cost or degradation of performance.  Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate Risk | Can potentially cause disruption of schedule, increased cost or degradation of performance.  Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High Risk | Is likely to cause significant disruption of schedule, increased cost or degradation of performance.  Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |
| Risk of Unsuccessful Performance | Likelihood that Offerors proposed approach will cause a disruption of schedule, increase costs, and/or is unable to meet the Government's needs. |

AR Tab 3 at 77-78; AR Tab 6 at 367-68.

technically-rated quote if the Government determines that the price premium is warranted and the quote presents the best overall value to the Government.

AR Tab 3 at 74; AR Tab 6 at 364.

### 2.   The Initial Evaluation And Award

In July 2017, CSI, CAC, and two other offerors—[***]; and [***]—timely submitted quotes in response to the RFQ.  *See* Remand Decision at 2; *see generally* AR Tabs 7-10.  ICE conducted an initial technical evaluation of these quotes during July 17-27, 2017.  *See* Remand Decision at 2; *see generally* AR Tabs 15-21.  ICE also engaged in several rounds of discussions with the offerors regarding various omissions, deficiencies, and weaknesses in the offerors' respective quotes.  *See* Remand Decision at 2; *see generally* AR Tabs 15-49.  The offerors submitted final revised proposals in response to the RFQ by October 3, 2017.  *See* Remand Decision at 2; *see generally* AR Tabs 41-49.

On October 19, 2017, ICE awarded the Charter Flight Contract to CAC.  *See* Remand Decision at 2; AR Tab 51 at 1600.  Thereafter, ICE notified the unsuccessful offerors of the agency's award decision on October 20, 2017.  *See* Remand Decision at 2; *see generally* AR Tabs 53-55.

### 3.   The Administrative Protests

CSI protested ICE's award decision to the Small Business Administration (the "SBA") on October 27, 2017, alleging that CAC did not qualify as a small business and was ineligible for the award.  AR Tab 245 at 6406-11.  On December 11, 2017, the SBA issued a formal size determination finding that CAC is a small business concern for the applicable size standard of the RFQ.  AR Tab 252 at 6495-505.

On October 30, 2017, CSI and [***] filed protests regarding ICE's award decision before the United States Government Accountability Office (the "GAO").  *See* Remand Decision at 3; *see generally* AR Tabs 58-60.  The GAO denied these protests on February 7, 2018.  *See* Remand Decision at 3; *see generally* AR Tabs 155-56.

### 4.   The Remand Proceedings And The Reevaluation

CSI commenced this bid protest action on February 16, 2018.  *See generally* Am. Compl. At the request of the government, the Court stayed further proceedings and remanded this matter

to ICE to reconsider the agency's award decision on February 21, 2018.  *See generally* Stay and Remand Order, dated Feb. 21, 2018.

During the remand proceedings, ICE re-entered discussions with all four offerors and the agency accepted revised quotations and updated pricing.  *See generally* AR Tabs 161-185.  ICE also re-examined each offerors' previous quotation and identified clarifications, weaknesses, and deficiencies that needed to be addressed.  AR Tab 185 at 6032.  ICE received revised quotations from all four offerors on March 5, 2018.  *See generally* AR Tabs 165-174.

On March 8, 2018, ICE sent questions to all four offerors.  *See generally* AR Tabs 175-178.  All four offerors responded to these questions by March 12, 2018.  *See generally* AR Tabs 179-184.  Thereafter, ICE's Technical Evaluation Committee (the "TEC") conducted an evaluation of the revised quotes in accordance with the source selection plan and evaluation factors set forth in the RFQ.  AR Tab 189 at 6111; *see generally* AR Tabs 189-201.

With respect to the Technical Capability factor, ICE awarded each offeror the following ratings during the re-evaluation:

| Quoter | Subfactor 1: Technical Approach/QASP | Subfactor 2: Charter Aviation Experience | Subfactor 3: Key Personnel | Overall |
|---|---|---|---|---|
| CAC | Outstanding | Good | Outstanding | Outstanding |
| CSI | Outstanding | Outstanding | Outstanding | Outstanding |
| [***] | Outstanding | Acceptable | Good | Good |
| [***] | Outstanding | Acceptable | Outstanding | Good |

AR Tab 196 at 6203; *see generally* AR Tabs 189-93 (providing a summary memo attaching four "worksheets" with "further detail and in-depth analysis").  During the re-evaluation, ICE's Business and Past Performance Evaluation Committee (the "BEC") assigned the following past performance ratings to each offeror:

| Quoter | Past Performance Rating |
|---|---|
| Classic Air Charter | Satisfactory Confidence |
| CSI Aviation | Satisfactory Confidence |
| [***] | Satisfactory Confidence |
| [***] | Satisfactory Confidence |

AR Tab 196 at 6204-05.

### a.   Re-evaluation Of CAC's Quote

During the re-evaluation of CAC's quote under the Technical Capability factor, the TEC rated CAC's quote as "Outstanding" under the Technical Approach subfactor, because the quote "presented 7 strengths that significantly benefit the government in several ways," "[n]o weaknesses or deficiencies were noted," and the risk of unsuccessful performance was very low. AR Tab 190 at 6118; *see also* AR Tab 189 at 6112; Oral Arg. Tr. at 26:7-20.  In this regard, the TEC identified strengths in the following 7 areas:

> (1) number of aircraft proposed; (2) the offeror's clear, detailed, thorough understanding and explanation of how they will meet the government's requirements; (3) the safety management program; (4) the QASP's systematic method for monitoring performance and quality assurance; (5) the QASP's performance management product which addressed all delivery performance objectives; (6) the fuel plan to purchase bulk fuel and pass on discounts to ICE; [and] (7) the offeror's site-lead plan.

AR Tab 190 at 6118.

> The TEC also found that CAC's quote:

> [D]emonstrates their capability to meet the exclusive use aircraft requirement . . . by including letters of intent from Swift Air (Letter from Swift CEO dated March 1, 2018) and World Atlantic (Letters from World CFO dated February 27, 2018) stating that both carriers are prepared to provide aircraft (Swift x [***] aircraft, World Atlantic x [***] aircraft) upon negotiating satisfactory terms for a service contract.

*Id*. at 6115 (referencing AR Tab 167 at 4746, 4760-61).  And so, the TEC found that CAC addressed all of the requirements in the RFQ and significantly exceeded the government's requirements under the Technical Approach subfactor.  AR Tab 196 at 6203.

With respect to the re-evaluation of CAC's quote under the Charter Aviation Experience subfactor, the TEC rated CAC's quote as "Good," because CAC's quote presented "2 strengths, which exceeded the government requirements and provide a benefit to the government;" no weaknesses or deficiencies were noted; and the risk of unsuccessful performance was low.  AR Tab 190 at 6120.  The TEC also found that CAC's charter aviation experience exceeded ICE's requirements, because CAC demonstrated that it was "proficient, knowledgeable, and experienced in performing large-scale, on-demand charter air services that are similar in size, scope, and complexity and performing work for government entities."  AR Tab 196 at 6203.  In

addition, while the TEC acknowledged that CAC's "experience is not exactly equal to [the] magnitude of the size, scope and complexity of the ICE requirement," the TEC found that "the experience outlined in the quotation demonstrates the offeror has significant experience in large-scale on demand charter services." Tab 190 at AR 6119. And so, the TEC awarded CAC's quote a "Good" rating for the Charter Aviation Experience subfactor. *Id.* at AR 6120.

ICE also found that CAC significantly exceeded the government's requirements for the Key Personnel subfactor, and the TEC awarded CAC's quote 2 strengths for the project manager's operations experience and certifications in connection with this subfactor. AR Tab 196 at 6203. And so, ICE concluded that CAC significantly exceeded the government's requirements for overall technical capability for the Charter Flight Contract. *Id.*

With respect to the re-evaluation of CAC's quote under the Past Performance factor, ICE's re-evaluation methodology differed from the original evaluation process in a number of ways. AR Tab 187 at 6036. For example, during the original past performance evaluation, the agency's evaluators did not download and save the past performance information retrieval system ("PPIRS") reports that were used to evaluate quotes. *Id.* Also, the original evaluation did not include a detailed evaluation of the categories for which offerors received adjectival ratings. *Id.* And so, ICE determined that the original evaluation of the Past Performance factor "may also have been made with certain inaccurate assumptions in regard to the relevancy of the reviews and the role that vendor's subcontractors would play during contract performance." *Id.* The agency documented the re-evaluation of the Past Performance factor for each offeror in a 41-page memorandum. *See generally* AR Tab 194.

With respect to the agency's re-evaluation of CAC's quote under the Past Performance factor, ICE found that CAC had a recent and relevant past performance record of performing air charter flights for government clients. AR Tab 196 at 6205. And so, the agency determined that it had a reasonable expectation that CAC would successfully perform the required services. *Id.*

Specifically, the BEC rated CAC's quote as "Satisfactory Confidence" under this factor. AR Tab 194 at 6144; AR Tab 196 at 6204. To determine this rating, the BEC compiled and evaluated three past performance questionnaires ("PPQs"), which rated CAC's recent air charter work on behalf of [***] as "Outstanding." AR Tab 194 at 6144-46, 6156-58. The BEC found that these "three PPQs demonstrate that CAC has a recent and relevant past performance record

of performing air charter flights for government clients." *Id.* at 6148.  The BEC also explained that, "[w]hile certain of the PPQs received for CAC . . . were of limited or partial relevance" due to a "smaller size," "scope," or "complexity," the BEC "still considers these references [to have some relevance] because they demonstrate CAC's ability to successfully perform charter flights internationally and for the removal of detainees." *Id.*

The BEC also evaluated PPQs for two potential CAC subcontractors:  Homeland Intelligence Technologies Aviation, Inc. ("HITA") and [***].  *Id.* at 6146-48.  With respect to the PPQ for [***], the BEC discounted [***]' experience because there was a "lack of information regarding scope and complexity" of its charter flight work in the PPQ.  *Id.* at 6147-48, 6161.  And so, the BEC rated CAC's quote as "Satisfactory Confidence" under the Past Performance factor.  *Id.* at 6144; AR Tab 196 at 6204.

### b.  Re-Evaluation Of CSI's Quote

With respect to the re-evaluation of CSI's quote under the Technical Capability factor, the TEC found that CSI significantly exceeded the government's requirements for overall technical capability.  AR Tab 196 at 6203.  In this regard, ICE found that CSI demonstrated a high proficiency and knowledge in meeting the government's requirements.  *Id.*  With respect to the Technical Approach subfactor, ICE also found that CSI addressed all of the requirements in the RFQ and that CSI's quote significantly exceeded the government's requirements.  *Id.*  In addition, ICE found that CSI's quote presented 5 strengths for this subfactor that significantly benefited the government.  *Id.*

With respect to the Charter Aviation Experience subfactor, ICE found that CSI significantly exceeded government requirements, because CSI demonstrated that it was "highly proficient, knowledgeable, and experienced in performing large-scale, on-demand charter air services that are similar in size, scope, and complexity and performing work for government entities."  *Id.*  In addition, ICE identified 2 strengths, which benefitted the government for this subfactor.  *Id.*  Lastly, with respect to the Key Personnel subfactor, ICE found that CSI significantly exceeded government requirements with 2 strengths noted.  *Id.*

With respect to the re-evaluation of CSI's quote under the Past Performance factor, the BEC found that several of CSI's past performance reports for charter flight contracts that were predecessors to the Charter Flight Contract received an evaluation rating of "Satisfactory."  *Id.* at

6205.  And so, the BEC rated CSI's quote a "Satisfactory Confidence" rating.  AR Tab 194 at 6144; AR Tab 196 at 6204.

To determine this rating, the BEC compiled and evaluated one PPQ and 13 recent PPIRS reports for CSI.  AR Tab 194 at 6148-51, 6162-75; AR Tab 196 at 6205.  The BEC also determined that the sole PPQ for CSI had "limited relevancy," because the "size of this contract" ([***]) "is smaller than the ICE requirement," "the scope is limited in that it does not involve the transport of detainees," and the "complexity of [the] work was '[r]outine'" with less "complexity" than the ICE requirement.  AR Tab 194 at 6148, 6162-63.

The BEC also considered 13 PPIRS reports for CSI and found that only 7 reports were relevant.  *Id*. at 6151.  The BEC also noted that all of these reports contained "Satisfactory" ratings, but that "[i]n all but one of those reports, the reviewers noted amounts of liquidated damages incurred by the CSI due to cancelled or delayed flights resulting from mechanical and crew-related issues."  *Id*. at 6149.  And so, the BEC concluded that it had a reasonable expectation that CSI will successfully perform the Charter Flight Contract.  *Id.; see also* AR Tab 196 at 6205.

With respect to the final evaluation factor for the RFQ—the Price factor—ICE re-evaluated the best and final price quotes from all four offerors by, among other things, comparing each price quote against the Independent Government Cost Estimate (the "IGCE"), historical pricing, and the price of the other quotes.  AR Tab 196 at 6206.  Based upon this evaluation, ICE determined that the prices proposed by all four offerors were fair and reasonable.  *Id*.  A summary of ICE's evaluation ratings and total pricing are set forth below:

|  | Factor 1: Technical Capability | *Sub-factor 1* | *Sub-factor 2* | *Sub-factor 3* | Factor 2: Past Performance | Factor 3: Total Price |
|---|---|---|---|---|---|---|
| CAC | Outstanding | Outstanding | Good | Outstanding | Satisfactory | $635,419,376.40 |
| CSI | Outstanding | Outstanding | Outstanding | Outstanding | Satisfactory | $819,970,768.00 |
| [***] | Good | Outstanding | Acceptable | Good | Satisfactory | $[***] |
| [***] | Good | Outstanding | Acceptable | Outstanding | Satisfactory | $[***] |

*Id*. at 6207.

Lastly, ICE conducted a trade-off analysis of all four quotes during the re-evaluation.  *Id*. at 6207-25.  During the trade-off analysis, ICE's Source Selection Authority (the "SSA")

considered the strengths of each quote and the benefits that each strength would provide to the government. *Id*. at 6208-12 (providing the analysis of CAC's quote), 6212-17 (providing the analysis of CSI's quote and comparison with CAC's quote). The SSA also found that the respective quotes of CAC and CSI "approach equality" based upon the non-price factors, which included the Technical Capability factor (both firms rated "Outstanding") and the Past Performance factor (both firms rated "Satisfactory Confidence"). *Id*. at 6225; *see id.* at 6207, 6217.

Based upon this finding, the SSA concluded that price would be more important in making the award determination and the SSA determined that:

> CAC's price is significantly lower than CSI's price, the difference in the total evaluated price being $184,551,392.40 (this delta was calculated for the quoters' pricing for base plus four option years and does not include the potential six-month extension). This is a large price difference for the benefit of CSI's Charter Aviation Experience, the only sub-factor wherein CSI had more qualitative strengths than CAC. While Charter Aviation Experience was the second most important sub-factor within Technical Capability factor, Technical Approach/QASP (sub-factor 1) was the most important sub-factor in Technical Capability. For sub-factor 1, while both CSI and CAC had many strengths that would significantly benefit the government, CAC presented a stronger sub-factor 1 quotation because of the qualitative merits of their Technical Approach/QASP quotation.

*Id*. at 6225. Because CAC received an overall Technical Capability factor rating of "Outstanding," which included several qualitative strengths highlighted in the Technical Approach, Charter Aviation Experience, and Key Personnel subfactors, and because CAC has a "Satisfactory" past performance record and presented the lowest price among all offerors, the SSA concluded that CAC's quote presented the best overall value to the government. *Id*. at 6212. And so, the SSA recommended that ICE award the Charter Flight Contract to CAC. *Id*. at 6225.

### B. Procedural Background

On February 16, 2018, CSI filed the complaint in this bid protest matter. *See generally* Compl. On February 20, 2018, the government filed an unopposed motion to remand this matter to ICE. *See generally* Def. Mot. to Remand.

On February 21, 2018, the Court remanded this matter to ICE to allow the agency to reconsider its award decision, in light of CSI's allegations, a recent decision by the GAO, and

any new information gathered during the proposed remand period, and the Court stayed further proceedings until March 23, 2018. *See generally* Stay and Remand Order, dated Feb. 21, 2018. On February 22, 2018, the Court entered a Protective Order in this matter. *See generally* Protective Order. On March 19, 2018, the Court extended the stay and remand period until April 13, 2018. *See* Stay and Remand Order, dated Mar. 19, 2018.

On April 23, 2018, the government filed the remand decision awarding the Charter Flight Contract to CAC. *See generally* Remand Decision. On May 4, 2018, the government filed the administrative record. *See generally* AR. On May 7, 2018, CSI filed an amended complaint. *See generally* Am. Compl.

On May 15, 2018, CSI filed a motion for judgment upon the administrative record. *See generally* Pl. Mot. On May 29, 2018, the government and CAC filed their respective cross-motions for judgment upon the administrative record and responses and oppositions to CSI's motion for judgment upon the administrative record. *See generally* Def. Mot.; Def.-Int. Mot. On June 6, 2018, CSI filed a response and opposition to the government's and CAC's respective cross-motions for judgment upon the administrative record and a reply in support of its motion for judgment upon the administrative record. *See generally* Pl. Resp. On June 13, 2018, the government and CAC filed their respective reply briefs in support of their cross-motions for judgment upon the administrative record. *See generally* Def. Reply; Def.-Int. Reply.

On June 26, 2018, the Court held oral argument on the parties' cross-motions. These matters having been fully briefed, the Court resolves the pending motions.

## III.   LEGAL STANDARDS

### A.  Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This Court reviews agency actions in bid protest matters under the "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act). And so, under the Administrative

Procedure Act standard, an award may be set aside if: "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In this regard, the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id*. at 1351 (internal citations omitted).

In reviewing an agency's procurement decision, the Court recognizes that the agency's decision is entitled to a "presumption of regularity."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted).  In addition, the Court should not substitute its judgment for that of the agency.  *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997).  And so, "'[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law.'"  *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003) (quoting *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003)).

This standard "is highly deferential."  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  As long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted).  But, if "the agency entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency," then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious."  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

**B.  Judgment Upon The Administrative Record**

Generally, RCFC 52.1 limits this Court's review of an agency's procurement decision to the administrative record.  RCFC 52.1; *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence.").  And so, unlike a summary judgment motion brought pursuant to RCFC 56, "the existence of genuine issues of material fact does not preclude judgment upon the administrative record" under RCFC 52.1.  *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011) (citations omitted); RCFC 56.  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

**C.  Injunctive Relief**

Under its bid protest jurisdiction, the Court "may award any relief [it] considers proper, including declaratory and injunctive relief . . . ."  28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  In deciding whether to grant injunctive relief, the Court "considers: (1) whether . . . the plaintiff has succeeded upon the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief."  *PGBA, L.L.C. v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *see also Centech Grp., Inc.*, 554 F.3d at 1037.  In this regard, the United States Court of Appeals for the Federal Circuit has held, within the context of granting a preliminary injunction, that:

> No one factor, taken individually, is necessarily dispositive.  If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others.  If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (citations omitted).

16

A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon a motion for injunctive relief. *Cf. Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd*., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a plaintiff who cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief). This Court has also found success upon the merits to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." *Dellew Corp. v. United States*, 108 Fed. Cl. 357, 369 (2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007)). But, while success upon the merits is necessary, it is not sufficient alone for a plaintiff to establish that it is entitled to injunctive relief. *See Contracting, Consulting, Eng'g L.L.C. v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well." (citations omitted)).

### D.  Best Value Determinations

Lastly, this Court affords contracting officers a great deal of discretion in making contract award decisions, particularly when the contract is to be awarded to the offeror that will provide the best value to the government. *See TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958-59 (Fed. Cir. 1993); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355-56 (Fed. Cir. 2004). The Court has held that the government's best value determination should not be disturbed, if the government documents its analysis and includes a rationale for any business judgments and trade-offs made in reaching that decision. *See Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009). And so, a decision to award a contract is least vulnerable to challenge when that decision is based upon a best value determination. *PlanetSpace, Inc. v. United Sates*, 96 Fed. Cl. 119, 125 (2010).

## IV.    LEGAL ANALYSIS

The parties have filed cross-motions for judgment upon the administrative record on the issue of whether ICE's decision to award the Charter Flight Contract to CAC was reasonable. CSI argues in its motion that ICE's award decision was arbitrary and capricious, because ICE improperly evaluated CAC's quote under the RFQ's Technical Capability factor and improperly

evaluated the quotes submitted by CAC and CSI under the RFQ's Past Performance factor.  *See generally* Pl. Mot.  The government and CAC counter in their respective cross-motions that the administrative record shows that ICE's decision to award the Charter Flight Contract to CAC was reasonable and in accordance with the terms of the RFQ, because ICE conducted a reasonable re-evaluation of quotes during the remand proceedings consistent with the requirements of the RFQ.  *See generally* Def. Mot.; Def.-Int. Mot.

For the reasons discussed below, the administrative record makes clear that ICE conducted a reasonable re-evaluation of responsive quotes for the Charter Flight Contract and that the agency reasonably determined the quotes submitted by CSI and CAC approached equality and that CAC's quote presented the best value to the government.  And so, the Court: (1) **DENIES** CSI's motion for judgment upon the administrative record; (2) **GRANTS** the government's and CAC's respective cross-motions for judgment upon the administrative record; and (3) **DISMISSES** the amended complaint.

### A.  ICE Reasonably Evaluated CAC's Quote Under The Technical Approach Subfactor

As an initial matter, CSI's claim that the Court should set aside ICE's award decision because the agency unreasonably evaluated CAC's quote under the RFQ's Technical Approach subfactor is unsubstantiated by the record evidence.  In its motion for judgment upon the administrative record, CSI challenges ICE's decision to award CAC's quote an "Outstanding" rating under this subfactor because CAC did not demonstrate an ability to supply the aircraft proposed in its quote.[3]  Pl. Mot. at 10-21, 36-37.  CSI also argues that this rating is irrational because CAC did not satisfy the RFQ's requirement to demonstrate an ability to comply with Federal Aviation Regulation 117 ("FAR 117"), which pertains to flight duty time limitations and rest requirements for flight crew.  *Id*. at 35-36.  CSI's arguments are not supported by the administrative record for several reasons.

First, the administrative record shows that ICE reasonably determined that CAC would be able to provide the aircraft proposed in its quote, because CAC provided all of the information required by the RFQ regarding these aircraft.  AR Tab 6 at 334-35, 361-62; *see also* AR Tab 149

---

[3] CSI also suggests that if ICE had considered CAC's alleged shortcomings as a weakness under the Technical Approach subfactor, CAC could not have received an "Outstanding" rating under this subfactor.  *See* Oral Arg. Tr. at 27:21-28:25; *see also* AR Tab 6 at 366.

at 4232-39, 4246 (CAC's history and relationship with its proposed subcontractors); AR Tab 165 at 4488-90, 4510-13 (CAC's response to ICE's discussion letter); AR Tab 167 at 4746, 4760-61 (letters of intent between CAC and its proposed subcontractors); AR Tab 190 at 6115-18 (ICE's CAC Technical Evaluation Worksheet).  In this regard, the RFQ provides that CAC and other offerors must demonstrate that their approach would meet ICE's exclusive use aircraft requirements.  AR Tab 6 at 361.  To that end, the RFQ requires that offerors provide the following information for each proposed aircraft:

1. Provide FAA certifications in accordance with 14 CFR Part 121 or Part 135;
2. Provide FAA registration number(s);
3. Identify aircraft owner;
4. Identify number of seats and configuration;
5. Identify aircraft make and model for each aircraft proposed;
6. Provide copies of required insurance and liability and hull insurance coverage; [and]
7. Outline how the offeror will comply with the requirements of FAR 117.

*Id*. at 361-62.

The record evidence also shows that CAC provided all of the information required under the terms of the RFQ to show an ability to provide the proposed aircraft.  AR Tab 149 at 4232-39, 4246; AR Tab 165 at 4488-90, 4510-12; AR Tab 167 at 4746, 4760-61; AR Tab 190 at 6115-18.  Specifically, the administrative record shows that CAC:  (1) identified 24 aircraft to be exclusively used for the Charter Flight Contract; (2) provided ICE with letters of intent from two proposed air carrier subcontractors; and (3) explained CAC's long history working with the proposed aircraft carrier subcontractors.  AR Tab 149 at 4232-39, 4246; AR Tab 165 at 4488-90, 4510-12; AR Tab 167 at 4746, 4760-61; AR Tab 190 at 6115-18.

In addition, while CSI correctly points out that CAC did not include executed sub-contracting agreements or teaming agreements with any air carriers in its quote, the plain terms of the RFQ make clear that CAC had no obligation to do so.  *See* AR Tab 6 at 334-35, 361-62; Pl. Mot. at 11-17.  Indeed, a careful review of the RFQ shows that there is no requirement in the RFQ for responsive quotes to include any agreements with aircraft carriers.  *See* AR Tab 6 at 334-35, 361-62.  And so, the record evidence does not support CSI's claim that ICE improperly determined that CAC met the requirement for the exclusive use of aircraft under the RFQ's Technical Approach subfactor.

Second, CSI's claim that ICE erred in awarding CAC's quote an "Outstanding" rating under this subfactor, because CAC's proposed price fell below the Independent Government Cost Estimate for the Charter Flight Contract, similarly lacks support in the administrative record. Pl. Mot. at 19. The administrative record shows that all of the prices proposed in the responsive quotes for this contract—including the price proposed by CSI—were lower than the IGCE. AR Tab 195 at 6185-86. And so, CSI has not shown that CAC's proposed price demonstrates an inability to meet ICE's exclusive use aircraft requirements.

In addition, contrary to CSI's claims in its motion, the administrative record also shows that ICE appropriately considered the risk of CAC's non-performance under the Charter Flight Contract in the event that a dispute arose between CAC and CSI regarding the teaming agreements that CSI currently has with several air carriers. Pl. Mot. at 16-20. In this regard, the record evidence makes clear that ICE considered this potentiality and determined that:

> It appears to the government that the air carrier subcontractors are willing and able to perform work for both of these prime vendors. Although there is risk of non-performance, if the air carriers are constrained in litigation related to the teaming agreements referenced in CSI's quotation, this is a risk ICE will undertake considering the affirmations received from air carriers in CAC's quotation, the qualitative strengths of CAC's quotation overall, and the enormous cost savings presented in CAC's price quotation.

AR Tab 196 at 6217. And so, again, the record evidence does not support CSI's claim that ICE irrationally evaluated CAC's quote under the Technical Approach subfactor.

Lastly, CSI's claim that CAC failed to demonstrate an ability to satisfy the RFQ's FAR 117 requirement is also unsubstantiated. The administrative record shows that CAC addressed how it would comply with flight crew limitations and rest requirements in its quote. Specifically, CAC states in its quote that CAC would "permit augmented flights in accordance with FAR 117" and that CAC "will review FAR 117 compliance and accommodate with augmented crews as required." AR Tab 165 at 4510, 4513.

CSI quibbles with ICE's evaluation because CAC did not provide more detail in its quote about how it would comply with FAR 117. Pl. Mot. at 35-36. But, a careful review of the administrative record shows that the RFQ requires only that CAC and other offerors outline how they would comply with the requirements of FAR 117. AR Tab 6 at 361-62. CSI points to no requirement in the RFQ that offerors provide a specific level of detail regarding FAR 117 compliance and the Court finds no such requirement in the RFQ. *See id.*; s*ee generally* Pl. Mot.

It is also important to note that, as the government observed during oral argument, ICE rated CAC's quote "Outstanding" under The Technical Approach subfactor based upon 7 strengths showing that CAC exceeded the RFQ's requirements.  Oral Arg. Tr. at 26:4-6.  Given this, the record evidence shows that ICE reasonably determined that CAC's quote satisfied the RFQ's requirements and the agency's decision to rate the quote "Outstanding" under the Technical Approach subfactor was rational.  AR Tab 165 at 4510, 4513; AR Tab 190 at 6116.

### B.  ICE's Evaluation Of CAC's Quote Under The Charter Aviation Experience Subfactor Was Reasonable

The record evidence also shows that ICE reasonably evaluated CAC's quote under the RFQ's Charter Aviation Experience subfactor.  And so, CSI's challenge to ICE's decision to award CAC's quote a "Good" rating under this subfactor similarly lacks support in the administrative record.

In its motion, CSI argues that ICE improperly considered information about CAC's proposed key personnel and subcontractors in conducting the evaluation for this subfactor.  Pl. Mot. at 21-26; AR Tab 165 at 4492, 4540-41.  But, the plain language of the RFQ makes clear that ICE properly evaluated CAC's quote under the Charter Aviation Experience subfactor and appropriately considered the experiences of CAC's proposed subcontractors and key personnel in evaluating charter aviation experience.  AR Tab 6 at 362.

In this regard, the RFQ provides that "[o]fferors' charter aviation experience descriptions shall also indicate if those services were performed by the [o]fferor's key personnel and subcontractors included in their quote."  *Id*.  The RFQ also makes clear that CAC and other offerors could rely upon "other relevant charter air" service experience to satisfy the Charter Aviation Experience subfactor.  *Id.*  Given this language in the RFQ, CSI's argument that ICE should not have considered the prior work experiences of CAC's proposed teaming partners— [***] and A Jet Away, Incorporated ("AJA")—in evaluating the Charter Aviation Experience subfactor is belied by the plain terms of the RFQ.

The administrative record also shows that CAC properly identified a definitive role for [***] and substantiated the experience of AJA in its quote.  AR Tab 165 at 4486-87, 4506-07, 4541-43.  Specifically, the administrative record shows that CAC states in its quote that "[***]'s role will be in helping to build out the broader network to support the IDIQ portions of the

anticipated order," and that "[***] will provide technical and advisory support to CAC management for the ICE Air Charter Services." *Id*. at 4486, 4506, 4543. The administrative record also shows that CAC substantiates AJA's charter aviation experience in its quote by showing that, among other things, AJA's corporate owner had been involved with corporate and airline companies since 2005. *Id*. at 4506-07, 4541-42. Given this, CSI's objection to the consideration of the experience of these two teaming partners lacks evidentiary support.

CSI's claim that CAC improperly relied upon the prior experience of its proposed project manager, Don Moss, to satisfy the Charter Aviation Experience subfactor is equally misplaced. Pl. Mot. at 22. The administrative record shows that Mr. Moss has prior experience managing an exclusive charter flight contract with the United States Department of Homeland Security's Federal Emergency Management Agency and managing another charter flight contract with the United States Department of State. AR Tab 165 at 4549-52; AR Tab 190 at 6118-20. As discussed above, the RFQ permits ICE to consider such prior work experience. AR Tab 6 at 362, 365. And so, the administrative record shows that ICE appropriately considered the experiences of Mr. Moss and CAC's proposed teaming partners in evaluating CAC's quote under the Charter Aviation Experience subfactor.

In addition, the record evidence shows that ICE appropriately evaluated CAC's relative charter aviation experience within the context of the requirements for the Charter Flight Contract. In this regard, the agency found that CAC's prior charter aviation experience was not of the precise magnitude, scope, and complexity required under the Charter Flight Contract. AR Tab 190 at 6119. But, ICE also determined that CAC has significant experience performing large-scale, on demand charter services that are of a similar size, scope, and complexity to ICE's needs. *Id*. at 6119-20. Indeed, as the government notes in its cross-motion, ICE assigned 2 strengths to CAC's quote for exceeding the government's requirements under the Charter Aviation Experience subfactor. *Id*. at 6120. And so, the record evidence supports the agency's evaluation and decision to rate CAC's quote as "Good" under this subfactor.

### C.  ICE Reasonably Evaluated The Past Performance Factor

A careful review of the administrative record also makes clear that CSI's remaining two challenges related to the re-evaluation of the quotes submitted by CAC and CSI under the RFQ's Past Performance factor are also without merit.

### 1.  ICE Reasonably Evaluated CAC's
### Quote Under The Past Performance Factor

First, CSI's claim that ICE improperly relied upon past performance questionnaires ("PPQs") involving the [***], [***], and [***], in evaluating CAC's quote under the Past Performance factor lacks evidentiary support. Pl. Mot. at 26-30.  In its motion, CSI argues that ICE should not have considered these PPQs because CAC was not the prime contractor for some of these contracts.  *Id.* at 27-29.  But, the administrative record shows that the RFQ permits ICE to "use other information available from ICE and Government sources to evaluate an [o]fferor's past performance."  AR Tab 6 at 363, 365-66.  Given this, the Court finds no error in ICE's decision to consider CAC's prior work as a subcontractor in evaluating the Past Performance factor.

The Court also finds no support in the administrative record for CSI's argument that ICE assumed without a rational basis that CAC's past work with [***] was similar to the requirements for the Charter Flight Contract. Pl. Mot. at 27-28.  In this regard, the administrative record shows that ICE found the PPQ for [***]—which involved the removal of foreign workers—to have "partial relevance," because the size of the work for that contract was smaller than the ICE requirement.  AR Tab 194 at 6145.  But, ICE also found that the "scope and complexity" of the work for this contract "involve[d] elements that are quite similar to ICE's requirement in terms of security concerns and international removals aboard aircraft."  *Id.*  And so, again, the administrative record supports ICE's decision to consider this PPQ in evaluating the CAC's past performance.

CSI's argument that ICE should not have considered a PPQ for [***] when evaluating CAC's quote is similarly belied by the record evidence.  CSI argues that ICE's evaluation was flawed because CAC failed to identify a definitive role for this teaming partner in its quote. Pl. Mot. at 28-29.  But, a review of the record evidence shows that CAC clearly states in its quote that [***] would provide CAC with technical support in connection with the Charter Flight Contract.  AR Tab 165 at 4543; *id.* at 4491 (explaining that [***] is "part of '[***]' and '[***]' as referenced in [CAC's] proposal.").  And so, CSI's challenge is not supported by the record evidence.

A review of the administrative record also makes clear that ICE balanced the fact that several of CAC's PPQs had limited or partial relevance with the fact that CAC consistently received high performance ratings in evaluating CAC's quote.  AR Tab 194 at 6144-48; 6156-61.  After performing this balance, ICE reasonably determined that it has "a reasonable expectation that CAC will successfully perform the required effort."[4]  *Id*. at 6148.  Because the administrative record shows that there was a rational basis for ICE's evaluation determination, the Court will not set aside ICE's determination.

### 2.  ICE Reasonably Evaluated CSI's Quote Under The Past Performance Factor

CSI's final challenge to the evaluation of its own quote under the RFQ's Past Performance factor is equally unavailing, because the record evidence shows that ICE reasonably awarded CSI's quote a "Satisfactory Confidence" rating under this factor.

In this regard, the administrative record shows that ICE considered one PPQ and 13 recent PPIRS reports in conducting the re-evaluation of CSI's quote under the Past Performance factor.  *Id.* at 6148-51, 6162-75; AR Tab 196 at 6204-06.  The administrative record also shows that ICE determined that the sole PPQ for CSI had "limited relevancy," because, among other things, the size of the contract at issue was smaller than the ICE requirement.  AR Tab 194 at 6148.  And so, ICE balanced the limited relevance of this PPQ with the high performance rating in the PPQ and determined that it had "a reasonable expectation that CSI will successfully perform" the Charter Flight Contract.  *Id.* at 6148-49, 6162-63.

The administrative record also shows that ICE appropriately considered the PPIRS reports for CSI in evaluating the Past Performance factor.  Specifically, the record evidence shows that ICE found 7 of the 13 PPIRS reports for CSI to be relevant and that the relevant reports all contained evaluation ratings of "Satisfactory."  *Id.* at 6151.  But, the agency also found that in all but one of these reports, "the reviewers noted amounts of liquidated damages incurred by the CSI due to cancelled or delayed flights resulting from mechanical and crew-related issues."  *Id.* at 6149.  And so, ICE rated CSI's quote as "Satisfactory Confidence" under

---

[4] The administrative record also shows that ICE carefully documented its re-evaluation of quotes under the RFQ's Past Performance factor.  AR Tab 187 at 6036-37; AR Tab 194 at 6144-51.

the Past Performance factor and the agency concluded that it had a reasonable expectation that CSI will successfully perform the required services. *Id*. at 6144, 6151; AR Tab 196 at 6204-05.

CSI's claim that ICE's evaluation was flawed because CSI received a lower rating under the Past Performance factor during the re-evaluation of quotes than it received during the initial evaluation of responsive quotes is also unsubstantiated by the record evidence. While there is no dispute that CSI received a higher rating of "Substantial Confidence" under the Past Performance factor during the initial evaluation, it is also undisputed that ICE modified the evaluation process for this factor for the re-evaluation of quotes during the remand proceedings. AR Tab 50 at 1580-81; AR Tab 196 at 6204-05.

As ICE explains in a memorandum documenting the revised methodology for evaluating the Past Performance factor during the remand proceedings, "[i]n the original . . . evaluation, the evaluator did not download and save PPIRS reports that were used in the evaluation[s] and instead relied on data that was available on the PPIRS web-based search functions." AR Tab 187 at 6036. In addition, ICE "did not include a detailed evaluation of the categories for which [offerors] received adjectival ratings" during the initial evaluation. *Id*. Given this, the differences between the ratings that CSI received under the Past Performance factor during the initial evaluation and re-evaluation, alone, do not demonstrate that ICE conducted an irrational evaluation process.

The Court is also unpersuaded by CSI's argument that ICE unfairly considered the issue of liquidated damages when conducting the re-evaluation of CSI's past performance. While there is no dispute that ICE found that all but one of the relevant PPIRS reports for CSI noted the liquidated damages incurred by CSI due to cancelled or delayed flights, CSI does not identify any language in the RFQ that would prohibit ICE from considering liquidated damages when evaluating past performance. AR Tab 6 at 363, 365-66; AR Tab 194 at 6149; Pl. Mot. at 32-34. In fact, as discussed above, the RFQ clearly states that ICE may "use other information available from ICE and Government sources to evaluate an Offeror's past performance." AR Tab 6 at 363, 366. And so, again, CSI's challenge to the evaluation of its quote under the Past Performance factor lacks record support. *Id*.

CSI's unequal treatment claim is also unpersuasive. In its motion, CSI argues that ICE did not treat CSI and CAC equally when the agency evaluated past performance, because ICE

did not engage CSI in discussions regarding a PPQ from the [***]. Pl. Mot. at 34-35. To support this argument, CSI correctly notes that ICE engaged CAC in discussions regarding information in CAC's quote about the roles of proposed subcontractors during the re-evaluation. *Id.*; AR Tab 161 at 4478-79. But, the record evidence shows that ICE viewed the information originally provided in CAC's quote to be a weakness. AR Tab 161 at 4478-79. In contrast, there is no dispute that ICE did not similarly find the information in CSI's quote regarding the subject PPQ to be a weakness. AR Tab 162 at 4480-81. And so, the record simply does not support CSI's claim that ICE treated the two offerors unequally.[5]   AR at Tab 194 at 6144-51, 6156-75.

Indeed, at bottom, the record evidence in this matter shows that ICE reasonably evaluated the quotes submitted by CAC and CSI under the RFQ's Past Performance factor during the remand proceedings. The record evidence also shows that ICE conducted the re-evaluation of these quotes in accordance with the terms of the RFQ. While CSI disagrees with the conclusions reached by the agency as a result of the re-evaluation process, CSI points to no evidence in the record to show that ICE's re-evaluation was either irrational or contrary to the terms of the RFQ. And so, CSI's challenges to ICE's evaluation of the Past Performance factor are without merit.

### D. ICE's Best Value Judgment Was Reasonable

Lastly, in light of the record evidence showing that ICE conducted a sound re-evaluation of quotes in accordance with the requirements of the RFQ, the record evidence also shows that ICE reasonably determined that the quotes submitted by CAC and CSI approached equality and that CAC's quote represented the best value to the government as the offeror proposing the lower price.

As discussed above, the record evidence shows that ICE reasonably determined that "the Technical Capability and Past Performance scores of CSI and CAC approach equality," consistent with the terms of the RFQ. AR Tab 196 at 6217. Under such circumstances, the RFQ provides that, "[i]n the event that two or more quotes are determined to be technically equivalent, award may be made to the lower priced quote." AR Tab 6 at 364.

---

[5] CSI also argues without persuasion that its relevant and successful performance as the incumbent contractor for ICE's requirements warrants a rating of "Substantial Confidence" under the Past Performance factor. Pl. Mot. at 32, 35. But, the administrative record demonstrates that ICE found CSI's past performance reports to consistently reflect "Satisfactory" ratings for performance. AR Tab 194 at 6151. And so, the agency's "Satisfactory Confidence" rating is supported by the record evidence.

Because there is no dispute that CAC's proposed price was more than $184 million lower than CSI's proposed price, ICE reasonably determined that the price premium for CSI's quote was not warranted and that "CAC's quotation present[ed] the better overall value to the government." AR Tab 196 at 6217; *see also id.* at 6206-25. ICE's determination in this regard is fully consistent with the language in the RFQ. AR Tab 6 at 364. And so, the Court will not set aside ICE's determination. *See Blackwater Lodge & Training Center, Inc.*, 86 Fed. Cl. at 514.

### E.  CSI Is Not Entitled To Injunctive Relief

As a final matter, CSI has not demonstrated that it is entitled to the injunctive relief that it seeks in this matter. In the amended complaint, CSI requests various forms of injunctive relief, including that the Court order ICE to terminate the Charter Flight Contract. Am. Compl. at Prayer for Relief. But, as discussed above, CSI has not prevailed upon the merits of any of its challenges to ICE's evaluation of responsive quotes in connection with the Charter Flight Contract, or to the agency's decision to award this contract to CAC. Given this, CSI has simply not shown that it is entitled to the injunctive relief that it seeks in this matter. And so, the Court must deny CSI's requests for injunctive relief. *Cf. Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009); *Nat'l Steel Car, Ltd.*, 357 F.3d at 1325.

## V.    CONCLUSION

In sum, the administrative record in this matter shows that ICE reasonably evaluated CAC's quote under the RFQ's Technical Approach and Charter Aviation Experience subfactors and that the agency also conducted a reasonable evaluation of CAC's and CSI's quotes under the Past Performance factor. In addition, the administrative record shows that ICE reasonably determined that CAC's quote presented the best value to the government, consistent with the terms of the RFQ.

And so, for all of the foregoing reasons, the Court:

1. **DENIES** CSI's motion for judgment upon the administrative record;
2. **GRANTS** the government's and CAC's cross-motions for judgment upon the administrative record; and
3. **DISMISSES** this matter.

Judgment shall be entered accordingly.

Each party shall bear their own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on February 22, 2018.  This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**.  The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.  The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction, on or before **August 3, 2018**.

      **IT IS SO ORDERED.**

                            s/ Lydia Kay Griggsby
                            LYDIA KAY GRIGGSBY
                            Judge